805 So.2d 255 (2001)
NORTH BATON ROUGE ENVIRONMENTAL ASSOCIATION, and the Louisiana Environmental Action Network
v.
LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY.
No. 2000 CA 1878.
Court of Appeal of Louisiana, First Circuit.
November 14, 2001.
Rehearing Denied January 8, 2002.
*257 Adam Babich, New Orleans, for Plaintiff-Appellant North Baton Rouge Environmental Association and the Louisiana Environmental Action Network.
James B. Thompson, III, Baton Rouge, for Intervenor-Appellee City of Baton Rouge / Parish of East Baton Rouge.
Meredith Hoag Lieux, Baton Rouge, for Defendant-Appellee Louisiana Department of Environmental Quality.
Maureen N. Harbourt, Baton Rouge, for Defendant-Appellee Exxon Chemical Americas.
Robert H. Harrison, Jr., Baton Rouge, for Defendant-Appellee Exxon Companies, U.S.A.
William L. Schuette, Jr., Baton Rouge, Amicus Curiae Baton Rouge Chamber of Commerce.
R. Michael Lyons, Baton Rouge, Amicus Curiae Louisiana Mid-Continent Oil and Gas Association.
Henry T. Graham, Jr., Baton Rouge, Amicus Curiae Louisiana Chemical Association.
Before: FOIL and PETTIGREW, JJ., and KLINE,[1] J. Pro Tem.
PETTIGREW, Judge.
North Baton Rouge Environmental Association ("NBREA") and the Louisiana Environmental Action Network ("LEAN") sought judicial review of a decision by the Louisiana Department of Environmental Quality ("DEQ") that granted a permit to Exxon Chemical Americas ("Exxon") for the construction of a new polypropylene plant adjacent to its existing facility in East Baton Rouge Parish. The Nineteenth Judicial District Court upheld the permit grant and NBREA and LEAN appealed to this court. We affirm.

FACTS
On December 23, 1997, Paxon Polymer Company (subsequently acquired by Exxon) submitted to DEQ an application for a Part 70 Operating Permit for the construction and operation of a new polypropylene production unit adjacent to its existing Baton Rouge Polyolefins Plant ("BRPO"). Polypropylene is a non-hazardous foodgrade plastic material used in the manufacture of many commonly used household products. The plant is located in East Baton Rouge Parish, which, for the past several years, has been designated part of a five-parish non-attainment area for ozone pollution.
Non-attainment status signifies that an area has failed to meet the National Ambient Air Quality Standard for specific pollutants. For this reason, facilities in the area have undertaken mandatory and voluntary changes aimed at reducing the proportion of ozone that is related to industrial activities. In return, the participating facilities receive economic benefits and security for future business operations.
*258 To accommodate industrial growth in non-attainment areas, state and federal agencies responsible for controlling ozone have developed incentive-based regulations aimed at reducing the proportion of ozone emissions related to industrial activities. See LAC 33:III.601(B)(1). These regulations allow new permits to be issued where new emissions are "offset" by past emission reductions and the Lowest Achievable Emissions Rate ("LAER") is achieved by the new or modified emission source. These offsets or emission reduction credits ("ERCs") encourage voluntary over-compliance and are set at a higher figure than the emissions that the offsets cover; e.g., in this instance, a ratio of 1.2 to 1. Over time, air emissions will decrease, and a net air quality benefit will occur in the nonattainment area.
These ERCs are calculated in tons per year ("TPY") and are evidenced by, and registered in, the ERC bank established by DEQ pursuant to La. R.S. 30:2054(B)(3). The ERC bank only allows deposits of ERCs when the applicant voluntarily reduces volatile organic compounds ("VOC") emissions by more than is required by law (i.e., they are surplus) and only when said applicant agrees to permanently reduce such emissions through accepting enforceable permits or orders. 42 U.S.C. § 7503 and LAC 33:III.607(F) and 605. Reductions cannot be creditable as offsets if they are required by law; they must be voluntary and in excess of legal requirements. 42 U.S.C. § 7503(c)(2). Once created, banked ERCs are protected and can be used by the certificate owner, whether the original owner or the owner by transfer. LAC 33:III.623. If a company desires to make improvements or additions to its facility that would result in an emissions increase, it must acquire credits from the bank (either on its own, or by contract from someone else) and "cash" them out at a ratio of 1.2 banked TPY of emissions for every proposed 1 TPY of new emissions. 42 U.S.C. 7511(c)(10). These ERCs can, within ten years, be utilized by the same facility, between different facilities of the same company, or transferred between companies for the construction of new projects. This emissions trading market allows companies seeking to build new plants or to expand existing plants to purchase pollution reductions. Pursuant to DEQ regulations, a Non-attainment New Source Review ("NNSR")[2] is required for any modification to an existing stationary source that will cause an increase of 25 tons per year or more of VOCs. LAC 33:III.504(D)(4).
The net increase in VOC emissions associated with the Exxon BRPO polypropylene project is 32.54 TPY. Therefore, offsets were required at a ratio of 1.2 to 1, totaling 39.05 TPY. Accordingly, on January 20, 1998, BRPO received a transfer of 40 tons of VOC emissions credits from the account of Exxon's Baton Rouge Chemical Plant. DEQ notified Exxon on January 23, 1998, that its permit application was administratively complete. An ERC bank certificate was issued by DEQ on February 18, 1998, reflecting that 40 tons were transferred and applied to offset emissions for the BRPO Title V Permit.
Copies of a draft permit were forwarded to Exxon, the East Baton Rouge Parish Library and the EPA on June 25, 1998. On July 7, 1998, DEQ published a public notice in the Baton Rouge daily newspaper The Advocate, asking for public comments on the proposed facility. On July 23, 1998, the EPA sent a letter to DEQ expressing *259 concerns over the draft permit for Exxon's polypropylene plant, particularly regarding Exxon's proposed offsetting, alternative site analysis, and compliance with other new source requirements under state and federal law. DEQ responded to and addressed each question posed by the EPA and provided back-up documentation where necessary. On August 7, 1998, DEQ received a letter from the North Baton Rouge Environmental Association (NBREA) requesting a public hearing in the nearby Alsen community and a ninety-day extension of the public comment period.
After addressing the concerns raised by the EPA, DEQ received oral approval from EPA for proposed air permit. Notice of the public hearing was published in The Advocate in an enlarged format on September 15, 1998; however, prior to the announcement in the newspaper, Exxon notified NBREA of the date and location of the public hearing. A copy of the public notice was also hand-delivered to NBREA's president, Ms. Juanita Stewart. Pursuant to a request from Ms. Florence Robinson of NBREA, DEQ forwarded a copy of the draft permit and application to the Southern University Library.
On October 12, 1998, Ms. Mary Lee Orr, executive director of LEAN, also sent a letter to DEQ requesting a thirty-day extension of the public comment period. DEQ held a public hearing at the Alsen Community Center on October 14, 1998, at which time the public comment period was extended until 4:30 p.m. on October 30, 1998. Air permit No. 2581-VO was ultimately issued by DEQ on November 24, 1998. Since that date, the BRPO plant has been constructed and commenced operation in May 2000.

ACTION OF THE TRIAL COURT
Following DEQ's decision to grant a permit to Exxon for construction of the polypropylene facility, NBREA and LEAN filed the instant action seeking judicial review pursuant to La. R.S. 30:2050.21, in the Nineteenth Judicial District Court on December 23, 1998. Exxon, as the permittee in this matter, was permitted to intervene in the case on January 26, 1999.
In a motion filed November 23, 1999, DEQ moved to supplement the administrative record pursuant to La. R.S. 30:2050.21(D), for the purpose of adding two documents and two exhibits that were before the agency when it made its decision, but were inadvertently omitted from the record. Said motion was granted by the trial court on November 29, 1999.
A hearing was held on January 31, 2000, at which time oral arguments were presented by all parties. The district court, ex proprio motu, raised the issue of whether Louisiana's ERC banking program was constitutional, and requested additional briefs from the parties on this issue.
Oral argument was rescheduled for March 15, 2000. Prior to the March hearing, a number of interested parties filed amicus curiae briefs in this matter; namely, the Louisiana Mid-Continent Oil & Gas Association, the City of Baton Rouge/Parish of East Baton Rouge, the Baton Rouge Chamber of Commerce and the Louisiana Chemical Association.
The district court ruled in favor of DEQ at the March hearing and held that DEQ did not abuse its discretion in granting the permit to Exxon. Following the signing of the judgment on April 5, 2000, the district court denied NBREA and LEAN's application for rehearing. This appeal followed.

ASSIGNMENTS OF ERROR
In connection with their appeal in this matter, NBREA and LEAN have set forth the following assignments of error:

*260 1. The Court below erred in upholding the permit despite evidence in the record that clearly demonstrates DEQ and Exxon's failure to comply with Nonattainment New Source Review requirements.
2. The Court below erred in allowing Exxon to supplement the record after the fact and without following the proper procedure for supplementation of an administrative record.
3. The Court below failed to rule on DEQ's noncompliance with this Court's ruling in Rubicon, which requires DEQ to respond to all reasonable public comments.
4. The Court below erred in finding that DEQ complied with its constitutional duty as public trustee of the environment.

STANDARD OF REVIEW
Louisiana Revised Statute 30:2050.21 sets forth the procedure for judicial review of a final DEQ permit decision. Said statute states that the judicial review provisions of the Administrative Procedure Act (APA), La. R.S. 49:964(C), (F), and (G), including the standard of review, are applicable to DEQ proceedings. La. R.S. 30:2050.21(F). Judicial review pursuant to the APA is conducted by the court without a jury and is confined to the record. La. R.S. 49:964(F).
When reviewing an administrative final decision in an adjudication proceeding, the district court functions as an appellate court. Eicher v. Louisiana State Police, Riverboat Gaming Enforcement Division, 97-0121, p. 5 (La.App. 1 Cir. 2/20/98), 710 So.2d 799, 803, writ denied, 98-0780 (La.5/8/98), 719 So.2d 51. Pursuant to La. R.S. 30:2050.21(A), the Nineteenth Judicial District Court is vested with exclusive jurisdiction to review final permit actions, final enforcement actions or declaratory rulings made by DEQ. Any party aggrieved by a final judgment or interlocutory order or ruling of the Nineteenth Judicial District Court may appeal or seek review to this court. La. R.S. 2050.31.
Pursuant to La. R.S. 49:964(G), a reviewing court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify an agency decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: 1) in violation of constitutional or statutory provisions; 2) in excess of the statutory authority of the agency; 3) made upon unlawful procedure; 4) affected by other error of law; 5) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or 6) not supported and sustainable by a preponderance of the evidence as determined by the reviewing court.[3]
In Save Ourselves, Inc. v. Louisiana Environmental Control Commission, 452 So.2d 1152, 1159 (La.1984), the Louisiana Supreme Court stated that the "test of [La. R.S. 49:964(G)(6)[4]] is used in reviewing the facts as found by the agency, as opposed to the arbitrariness test used in reviewing conclusions and exercises of *261 agency discretion." See Coalition for Good Government v. Louisiana Department of Environmental Quality, 99-2843, p. 8 (La.App. 1 Cir. 10/18/00), 772 So.2d 715, 721, writs denied, XXXX-XXXX, XXXX-XXXX (La.4/12/01), 789 So.2d 589, 590.

DISCUSSION
In their initial assignment of error, NBREA and LEAN contend that the district court erred in upholding the issuance of the permit in light of evidence that DEQ and Exxon failed to comply with Non-attainment New Source Review requirements. Specifically, NBREA and LEAN argue that despite the fact that the record did not demonstrate compliance with federal law and state air regulations, DEQ granted a permit to Exxon, and the district court affirmed this decision. NBREA and LEAN now ask this court to reverse that decision.
NBREA and LEAN argue that it was Exxon's burden, as the permit applicant, to demonstrate its compliance with LAC 33.504(D)(1) and the federal Clean Air Act.
In its brief to this court, Exxon notes that NBREA and LEAN never raised the issue of compliance prior to their appeal to the Nineteenth Judicial District Court. Despite Exxon's objection, the district court, in its oral reasons for judgment issued on March 15, 2000, ruled that this was a legal issue and that NBREA and LEAN were not necessarily required to raise same during the public comment period. The district court also stated:
One of the legal issues is applicants shall be in compliance at all existing stationary sources owned or operated by the applicant. That's LAC 33:III.504(D)(1). I did not see in the record that Exxon showed that it was in compliance at all existing stationary sources owned or operated by applicant. Exxon's brief at page 20 says Exxon BRPO has a compliance history of no violations in over eleven years, which was (R.413), but I don't believe it specifically states that all existing or stationary sources owned or operated by applicant are in compliance.
The transcript of the March 15, 2000 hearing indicates that Exxon argued that a Title V general certification in the initial permit application submitted by its predecessor, Paxon, was specific enough to cover the requirements of LAC 33:III.504(D)(1). The district court rejected this argument and further stated:
I'm not going to go back and forth. It's a legal requirement. DEQ should have required that specific requirement.... The court will not remand this for that purpose.
Pursuant to the district court's ruling of March 15, 2000, Exxon supplemented the record on March 30, 2000, with a Certification of Compliance dated March 29, 2000. Said Certification of Compliance stated in pertinent part that:
Completion of this table will fulfill the requirements of Section 173(a)(3) of the Federal Clean Air Action [sic] and LAC 33:II[I].504(D)(1):
All existing stationary sources owned or operated by Exxon Chemical Americas, (Applicant), or by any person controlling, controlled by, or under common control with the applicant, in the state were in compliance with (or in compliance with a schedule of compliance to meet) all applicable state and federal emission limitations and standards, the Federal Clean Air Act, and all conditions in a state or federally enforceable permit as of November 24, 1998.
Accordingly, we find this assignment of error to be without merit.
The second error assigned by NBREA and LEAN is that the district *262 court erred in allowing Exxon to supplement the record with evidence of Exxon's compliance without following the proper procedure for supplementation of an administrative record. In support of this contention, NBREA and LEAN cite La. R.S. 49:964(E) and La. R.S. 30:2050.21(E) as the only instances in which additional evidence may be offered by the parties to supplement the administrative record once an aggrieved party has lodged its petition for judicial review. Moreover, NBREA and LEAN contend that such evidence must be presented to the department or agency.
By way of response, Exxon argues that contrary to the argument put forth by NBREA and LEAN, La. R.S. 49:964(E) and La. R.S. 30:2050.21(E) are not the only instances in which additional evidence may be introduced. Exxon cites La. R.S. 49:964(D), which states, in pertinent part, that in connection with a judicial review proceeding, "[t]he court may require or permit subsequent corrections or additions to the record."
Possibly because the evidence supplementing the record bolstered and gave support to the findings of DEQ, the district court did not feel compelled to send the information contained in the certification of compliance back to DEQ. Support for this view can be found in the oral reasons for judgment issued by the district court on March 15, 2000. In explaining its decision not to remand this matter back to DEQ, the district court stated:
[T]his case has been pending since November 1998, and if [NBREA and LEAN] could show me that Exxon had not complied somewhere, I would remand this, but there has been no showing, and there's been plenty of time to show that Exxon did not comply, and it would simply be a technical delay. The court will not remand this for that purpose. In future hearings if this has not been complied with, and the appellant can show a violation, then it would be remanded to DEQ to determine whether other violations, in fact, would have affected DEQ's decision.
Accordingly, we find this assignment of error to be without merit.
In their third assignment of error, NBREA and LEAN contend that the district court failed to rule on DEQ's noncompliance with this court's ruling in In the Matter of Rubicon, Inc., 95-0108 (La.App. 1 Cir. 2/14/96), 670 So.2d 475, 483, which requires DEQ to respond to all reasonable public comments. Specifically, NBREA and LEAN argue that DEQ failed to respond to their charge that the permitting of this facility is tantamount to environmental racism.
At the public hearing held regarding the permitting of the Exxon facility on October 14, 1998, Ms. Florence Robinson, a member of NBREA, charged:
Alsen is probably one of the best examples of environmental racism in the nation. The problem here goes far beyond mere environmental justice concerns. It is a case of outright discrimination. Many do not like to hear the term racism brought up today, claiming that that is all in the past. Unfortunately, Alsen has been forced to continue to endure the racist actions of the past. The decision to industrialize Alsen was not made by the people of Alsen. In fact, because of their race, the people of Alsen were deliberately and systematically denied the right to participate in government and shape their own destinies. Now, Alsen is told it must live with these racist decisions. This is clearly an injustice, and is unamerican [sic].
In a letter addressed to DEQ and dated October 30, 1998, Exxon responded to the *263 environmental justice concerns expressed by Ms. Robinson. Exxon cited a history of voluntary emissions reductions and stated that it did not feel that the allegations of environmental discrimination were valid. Additionally, DEQ, in its Public Comment Response Summary, responded to Ms. Robinson's comments and stated:
The property owned by Exxon Chemical Americas upon which the polypropylene unit will be constructed is within the industrial areas designated by The Plan of Government of the Parish of East Baton Rouge and the City of Baton Rouge for industrial development. The new Polypropylene Plant will be constructed in Industrial Area 3 located in north Baton Rouge, west of U.S. Highway No. 61 (Old Bayou Sara Road). By letter dated July 26, 1995, from the Office of the Planning Commission and signed by Richard E. Barker (Planner IV), the property was confirmed to be zoned M-2 Heavy Industrial.
The district court, in its reasons for judgment, stated:
The environmental justice review issue. It is unfortunate that the original zoning placed this industrial complex next to [the community of] Alsen. The fact that it was done a long time ago, doesn't make any difference in considering environmental justice because a lot of things were done a long time ago that were not right.... Placing this industrial area in the neighborhood of the Alsen community does not appear to be intentionally racist. It's between a railroad and a river in a relatively rural area. Exxon has used a plant facility that was already in existence. They're actually putting out less pollution than the plant that was there previously. Considering the other policy considerations, should Exxon locate this some place where there is an area where there is no pollution? That's not a particularly good idea. Should they locate it in another industrial area? Well, that only moves the problem to somebody else's city. Overall, in the balance, I cannot find that DEQ abused its discretion in putting [the Exxon plant] in an industrial area at the site of a prior plant that actually probably produced more pollution than the system that's been proposed.
Upon review of the record, we cannot say that DEQ failed to respond to the charges leveled by NBREA and LEAN. The Exxon facility at issue is situated in an industrially zoned area adjacent to a state highway, a railroad, and the Mississippi River. We conclude, as did the district court, that it is unfortunate that the Alsen community is also situated in this general area; however, this fact alone does not constitute environmental racism. This assignment of error is without merit.
The final assignment of error raised by NBREA and LEAN is that the district court erred in holding that DEQ complied with its constitutional duty as public trustee of the environment.
The district court, in it reasons for judgment, opined:
The next question is, weighing all those factors, is permitting a thirty-four or so ton ozone release in the East Baton Rouge area when we're not in attainment a violation of the constitutional standards [as set forth] in Save Ourselves [Inc. v. Louisiana Environmental Control Commission, 452 So.2d 1152 (La.1984)]? That requires a balancing effect. Exxon itself has been one of those industries which has significantly reduced emissions. It has done little things, like paid people to be on jury duty, which we always appreciate. They've put money back in the community. The question is, even though I *264 don't like the fact that we're putting thirty-four tons of ozone back in the air when we're not in attainment, should Exxon, which has done a lot to reduce emissions, be the one that suffers the consequences of our not being in attainment?
In balancing the pros and cons required by the constitution in Save Ourselves, the court finds that this small amount, which seemed to me when we took over this case to be a large amount,... that thirty-two tons is a small amount compared to a couple of days of automobile pollution, [and] does not outweigh other consideration.
Therefore, we find that DEQ did not abuse its discretion, and their decision is supported by a preponderance of the evidence.
In their brief to this court, NBREA and LEAN contend that DEQ is constitutionally mandated to protect the quality of the environment in the state. NBREA and LEAN further cite La. R.S. 30:2014, which provides that the secretary of DEQ acts as the primary trustee of the environment and must consider and follow the will and intent of the Constitution and statutory law in making any determination about the granting or denial of permits.
In its brief, Exxon responds with the argument that:
DEQ is not obligated to deny a permit simply because this is a nonattainment area. In this case, DEQ recognized that permitting Exxon's expansion would not have any significant impact on public health or the environment, and that these 32 TPY will not prevent the attainment or maintenance of the ozone [National Ambient Air Quality Standard].
Upon consideration of the arguments put forth by the parties, and careful review of the record in this matter, this court declines to substitute its judgment for that of DEQ, EPA, and the legislature. It is the opinion of this court that DEQ did not violate its constitutional duty to act as trustee of the environment.

CONCLUSION
For the above and foregoing reasons, the judgment of the district court that upheld DEQ's issuance of a Part 70 Operating Permit to Exxon for the construction and operation of a new polypropylene production facility is hereby affirmed. All costs associated with this appeal shall be borne equally by appellants, NBREA and LEAN.
AFFIRMED.
NOTES
[1] Judge William F. Kline, Jr., retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] The Non-attainment New Source Review program is mandated by the federal Clean Air Act (42 U.S.C. § 7401 et seq.) but is implemented through state laws collectively known as the State Implementation Program, or "SIP."
[3] A seventh basis for reversal or modification involves only cases covered by the Corrections Administrative Procedure Act (CARP), La. R.S. 15:1171 through 1177.
[4] Louisiana Acts 1997, No. 128, § 1 amended La. R.S. 49:964(G)(6) and added subsection (G)(7). As a result of the amendment of La. R.S. 49:964(G)(6), the "manifest error test," previously used in reviewing the facts as found by the agency, was replaced by a "preponderance of evidence" standard of review.