I (WHIPPLE, J.
The Louisiana Environmental Action Network (“LEAN”) and Albertha Hasten[1] sought judicial review, pursuant to LSA-R.S. 80:2050.21(A), of two final permit decisions granting major air permit modifications to Dow Chemical’s Louisiana Operations Complex (“Dow”) in Plaquemine, Louisiana, and a decision approving Dow’s Volatile Organic Compound (“VOC”) Emission Reduction Credit application, by the Louisiana Department of Environmental Quality (“the DEQ”). By judgment dated June 24, 2003, the Nineteenth Judicial District Court upheld the decision of the DEQ to grant the air permit modifications and the VOC Emission Reduction Credit application.
For the following reasons, we affirm.
FACTS AND PROCEDURAL HISTORY
On March 30, 2001, Dow applied for a permit to modify existing Permit No. 2024-V1, at the Light Hydrocarbons III Plant, to increase VOC emissions. In the application, Dow proposed to offset the emission increases called for in the requested permit modifications with emission reduction credits from the 1992 closure of a wastewater pond, Pond EC-2. Pond EC-2, a wastewater collection and treatment pond, had served as the end-point of a number of wastewater streams within the Dow facility, including a wastewater stream from the Cellulose Plant. The closure of Pond EC-2, and its replacement with a floating roof tank for storage and treatment of wastewater had resulted in a VOC emission reduction.
*8 On February 8, 2002, Dow applied for a modification of another existing permit. This permit authored a major modification of Cellulose |3PIant Air Permit No. 2227-VI. One of the projects addressed by the proposed modification, the Modified Low Salt Project,[2] was projected to result in a net increase of VOC emissions, thus constituting a “major modification,” and thereby invoking the nonattainment[3] new source review procedure by the DEQ.[4]
Dow further requested that the DEQ review and approve Dow’s application for certain VOC Emission Reduction Credits, identified as VOC-10, pursuant to Louisiana Administrative Code 33:111. Chapter 6. The emission reduction credits generated by the closure of Pond EC-2 and its replacement by a floating roof tank were the subject of the emission reduction credit application VOC-10, as discussed above in Dow’s application for a permit to modify the existing permit at the Light Hydrocarbons III Plant. According to Dow, the replacement of the pond with the floating roof tank resulted in a net reduction in VOC emissions. These emission reduction credits were used as the necessary offsets for the major modifications.
|4Both permit applications, relying on the VOC Emission Credit Application previously approved by the DEQ, requested adjustment of the permit limits for the existing facility based upon updated emission estimation factors and authorization of construction of modifications of the facility despite the increase in emissions.
After publication on September 19, 2002 of a notice of public hearings and a thirty-day comment period in The Advocate, The West Side Journal, and The Plaquemine Post South, the DEQ held public hearings on October 22, 2002. On October 29, 2002, at the close of the public comment period, the DEQ approved the applications and issued new permits, No. 2024-V2 and No. 2227-V2. In response to the VOC-10 application, the DEQ granted Dow emission reduction credits.
By letter dated November 7, 2002, representatives from the DEQ notified all interested parties, including LEAN, that Permits 2227-V2, 2024-V2, and Application VOC-10 had been granted. The DEQ attached to these letters copies of a lengthy and detailed document entitled “Basis for Decision” and “Public Comment *9 Response Summary” for each permit and application decision. The Basis for Decision included a detailed analysis, which formed the basis for the DEQ’s ultimate decision articulating a rational connection between the facts found and the order issued pursuant to the mandates of the Louisiana Supreme Court in Save Ourselves, Inc. v. Louisiana Environmental Control Commission, 452 So.2d at 1152, 1159 (La.1984).
Petitioners then filed a Petition for Review in the Nineteenth Judicial District Court, pursuant to LSA-R.S. 30:2050.21, seeking judicial review of the DEQ’s two final permit decisions, as well as its decision to approve Dow’s VOC Emission Reduction Credit application. After review and 1 ^consideration of the administrative record, the briefs, and oral argument of the parties, the district court rendered judgment and written reasons on August 7, 2003, affirming the action of the DEQ.
Specifically, the district court: (1) affirmed the DEQ’s issuance of the Light Hydrocarbons III air permit modification, Permit No. 2024-V2; (2) affirmed the DEQ’s issuance of the Emission Reduction Credit Certificate for VOC-10; and (3) remanded to the DEQ to remove the provisions of the Cellulose Plant pefmit modification, Permit No. 2227-V2, that involved the Modified Salt Project and VOC emission increases associated with the Modified Low Salt Project; the remainder of the provisions of Permit No. 2227-V2 were affirmed. LEAN filed the instant appeal, challenging the district court’s judgment.
STANDARD OF REVIEW
Under Louisiana law, the DEQ has a constitutional duty to act as the trustee of the environment. In re Shintech, Inc., 2000-1984, p. 7 (La.App. 1st Cir.2/15/02), 814 So.2d 20, 25, writ denied, 2002-0742 (La.5/10/02), 815 So.2d 845. The Supreme Court has interpreted this constitutional mandate to impose a “rule of reasonableness,” which requires the DEQ to determine, before granting approval of any proposed action affecting the environment, that adverse environmental impacts have been minimized or avoided as much as possible consistently with the public welfare. Save Ourselves, Inc., 452 So.2d at 1157. However, considerable weight is afforded to an administrative agency’s construction of a statutory scheme that it is entrusted to administer. Calcasieu League For Environmental Action Now v. Thompson, 93-1978, p. 12 (La.App. 1st Cir.7/14/95), 661 So.2d 143, 149; writ denied, 95-2495 (La.12/15/95), 664 So.2d 459.
| (¡In rendering a decision, the DEQ is required to: (1) make basic findings, as supported by the evidence, (2) make ultimate findings, which flow from the basic findings, and (3) to articulate a rational connection between the facts found and the order issued. Save Ourselves, Inc., 452 So.2d at 1159. This circuit has held that pursuant to Save Ourselves, Inc., the DEQ’s written findings of fact and reasons for decision must address whether: (1) the potential and real adverse environmental effects of the proposed project have been avoided to the maximum extent possible; (2) a cost-benefit analysis of the environmental impact costs balanced against the social and economic benefits of the project demonstrates that the latter outweighs the former; (3) there are alternative projects or alternative sites or mitigating measures that would offer more protection to the environment than the proposed project without unduly curtailing non-environmental benefits to the extent applicable. See In re Belle Company, L.L.C., 2000-0504, pp. 16-17 (La.App. 1st Cir.6/27/01), 809 So.2d 225, 238; In re Rubicon, Inc., 95-0108, p. 12 (La.App. 1st Cir.2/14/96), 670 So.2d 475, 483. *10 Louisiana Revised Statute 30:2050.21 sets forth the procedure for judicial review of a final permit decision of the DEQ. Judicial review provisions of the Administrative Procedure Act and its standard of review are applicable to DEQ proceedings. LSA-R.S. 30:2050.21(F). Judicial review is conducted by the court without a jury and is confined to the record. LSA-R.S. 49:964(F).
When reviewing an administrative final decision in an adjudication proceeding, the district court functions as an appellate court. North Baton Rouge Environmental Association v. Louisiana Department of Environmental Quality, 2000-1878, p. 7 (La.App. 1st Cir.11/14/01), 805 So.2d 255, 260, writ denied, 2002-0408 (La.4/19/02), 813 So.2d 1086. The Nineteenth Judicial District Court is vested with exclusive jurisdiction to review final permit actions, final enforcement actions, or declaratory rulings made by the DEQ. LSA-R.S. 30:2050.21(A). Any party aggrieved by a final judgment or interlocutory order or ruling of the Nineteenth Judicial District Court may appeal or seek review to this court. LSA-R.S. 30:2050.31.
A reviewing court may affirm the decision of the agency or remand the case for further proceedings. LSA-R.S. 49:964(G). The court may reverse or modify an agency decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or (6) not supported and sustainable by a preponderance of the evidence as determined by the reviewing court. North Baton Rouge Environmental Association, 2000-1878 at pp. 7-8, 805 So.2d at 260.
The manifest error test of LSA-R.S. 49:964(G)(6) was previously used in reviewing the facts as found by the agency, as opposed to the arbitrariness test used in reviewing conclusions and exercises of agency discretion. We note that Acts 1997, No. 128 § 1, effective June 12, 1997, amended paragraph G(6) to make the trial court a fact finder who weighs the evidence and makes its own conclusions of fact by a preponderance of the evidence. Multi-Care, Inc. v. State, Dept. of Health & Hospitals, 00-2001, p. 4 (La.App. 1st Cir.11/9/01), 804 So.2d 673, 675. See Acts 1997, No. 128 § 1.
On review, an appellate court should not reverse a substantive decision of the DEQ on its merits, unless it can be shown that the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental protection. In re Shintech, Inc., 2000-1984 at p. 7, 814 So.2d at 26. However, if the decision was reached procedurally, without individualized consideration and balancing of environmental factors conducted fairly and in good faith, it is the courts’ responsibility to reverse. Save Ourselves, Inc., 452 So.2d at 1159. The test for determining whether an action was arbitrary or capricious is whether the action taken was “without reason.” Calcasieu League for Environmental Action Now, 661 So.2d at 150.
DISCUSSION
In LEAN’S first assignment of error, it challenges the DEQ’s calculation of emission reduction credits available from the VOC-10 application. In its second assignment of error, LEAN contends that the district court erred in upholding the *11 DEQ’s approval of Dow’s application for credits for emission reductions (which credits are used as “offsets” to justify emission increases) when, according to LEAN, the law already required reduction of the emissions at issue and DEQ regulations specify that reductions, which are “otherwise required ... shall not be credited for purposes of satisfying the offset requirement,” citing LAC 33:III.504(F)(10). In its third assignment of error, LEAN contends that the district court erred in upholding the DEQ’s decision to increase Dow’s allowable VOC emissions without legally required offsets absent a “basic finding of facts as supported on the record” to explain the causes for the emissions increases, citing In re Rubicon, Inc., 95-0108 at p. 11,19670 So.2d at 482. In support, LEAN argues that the DEQ “is required to make a basic finding of fact as supported on the record,” and that the DEQ has offered only “speculative and contradictory justifications for its permitting decisionfs].”
Essentially, the underlying contention in all of LEAN’S assignments of error is that the DEQ erred in allowing Dow to use erroneously calculated emission reduction credits to justify VOC emission increases of more than fifty tons per year in a community that already violates health protection standards for air quality.
LEAN argues that in order to qualify as credits, emission reductions must be “surplus, permanent, quantifiable, and enforceable,” citing to LAC 33:III.607(F)(1). “Surplus Emission Credits” (referred to herein as “surplus”) are defined as credits that are “voluntarily created for an emissions unit and have not been required by any local, state, or federal law, regulation, order, or requirement.” LAC 33:111.605. As such, LEAN argues that pursuant to LAC 33:III.504(F)(10), emission reductions otherwise required by state regulations can not be used as credits for purposes of satisfying the offset requirement.
Additionally, LEAN contends that emission reduction credits may be used as offsets only if they are surplus when used to offset a permit modification. And, in order to determine whether offsets are “surplus,” an adjustment must be made to account for all new or revised federal or state regulations adopted between the time of the original reduction and the time the offsets are used. LEAN then, in brief, sets forth its theory of how Dow erroneously relied on emission reductions from the 1992 closure of wastewater Pond EC-2 as the source of its offsetting credit, contending that no surplus emission credit remains from the closure of the pond.
ImCiting LAC 33:III.2153(B),[5] which LEAN contends was promulgated by the DEQ to limit VOC emissions from industrial wastewater, LEAN argues that pursuant to the regulations, “[a]ny component ... containing] an affected VOC wastewa-ter stream, shall be controlled” in accordance with the requirements of the rules. LEAN contends that Dow had “improperly” allowed another compliance option pursuant to LAC 33:III.2153(G)(4), which provides that:
Wastewater components are exempt from the control requirements of Subsection B of this Section if the overall control of VOC emissions from the wastewater of affected source categories is at least 90 percent less than the 1990 baseline emissions inventory, and the following requirements are met...
*12 LEAN claims that pursuant to the Industrial Wastewater Regulations listed in LAC 33:111.2153, Dow had to either (1) implement controls on “any component ... if the component contains an affected VOC wastewater stream” (LAC 33:III.2153(B)), or (2) obtain an exemption by reducing “the overall ... VOC emissions from the wastewater” at the facility. LAC 33:III.2153(G)(4). Rather than implement controls on all wastewater components at the facility, Dow instead chose to comply with the Wastewater Regulations by reducing overall VOC emissions from all wastewater at the facility, including Pond EC-2, by more than 90%. In order to accomplish this 90% reduction, Dow closed the Pond EC-2 and replaced it with a closed tank. According to LEAN, this closure produced an amount of emission credits that have already been overdrawn by Dow, given the applicable statutes and regulations.
| n Contrariwise, Dow contends that while LEAN does not challenge any of the underlying emission figures, dates, events, or other facts, LEAN utilizes the “wrong” figures in calculating the reduction credits. Dow does not dispute that it applied for and obtained the exemption available under LAC 33:III.2153(G)(4), leading to a 90% reduction of all wastewater emissions from its facility. Dow contends that the issue is precisely whether, under LAC 33:111:2153, Dow was “required” to make a 90% reduction in all wastewater emissions (including those from the Pond EC-2), or whether Dow’s 1992 action was a voluntary “overcontrol” of those emissions. Dow asserts that the DEQ correctly found that Dow’s actions in 1992 constituted a voluntary “overcontrol” of emissions.
In support, Dow contends that the only emission reductions “required” are a 90% reduction in emissions from any “affected wastewater stream” citing LAC 33:III.2153(A), (B)(1) and (2), and (H)(1). Focusing on the last sentence of LAC 33:III.2153(B),[6] Dow argues that when an “affected wastewater stream” is mixed with other “unaffected” wastewater streams for treatment, as occurred in Pond EC-2, “the amount of VOC to be removed from the combined wastewater streams shall be at least equal to the total 112amount of VOC that would be removed from each individual stream so that they meet the reduction criteria mentioned above in this section.” LAC 33:III.2153(B). Dow contends that it is undisputed that the only “affected waste-water stream” flowing into Pond EC-2 was the Cellulose stream. Thus, Dow argues, had Pond EC-2 been operating in 1995, Dow would have been required to reduce VOC emissions by an amount “at least equal to” a 90% reduction in emissions from the Cellulose stream (the only *13 “individual stream” subject to the “reduction criteria” of LAC 33:III.2153(B)).
Dow avers that the DEQ properly interpreted LAC 33:111.2153(13) to require Dow only to reduce by 90% those VOC emissions attributable to the “affected waste-water stream,” or the Cellulose stream, not all emissions from Pond EC-2. Thus, Dow concludes that this is not an overall 90% reduction from the entire component, as LEAN claims, but rather only an amount “at least equal to the total amount of VOC” required to be removed from each “affected” stream prior to mixing. LAC 33:III.2153(B).
Dow further argues that LEAN’S strained reading of thé regulations would discourage companies from ever undertaking comprehensive wastewater treatment programs. Instead, companies would be encouraged to isolate “affected” wastewa-ter streams for separate containment and treatment, thus discouraging comprehensive reduction of VOC emissions from all wastewater. Dow contends that the DEQ’s interpretation of LAC 33:III.2153(B) was correct and proper, not “without reason.”
In regard to LAC 33:III.2153(G)(4), Dow contends that this Subsection encourages “over compliance,” in that it rewards emission reductions in excess of the control requirements of Subsection B. Further, Dow asserts that there are no mechanisms to compel a company to adopt the exemption standards of LAC 33:III.2153(G)(4), whereas the control | ^requirements of LAC 33:III.2153(B) call • for mandatory compliance and regulatory enforcement. Dow argues that because it chose to qualify for the exemption, and therefore reduce its emissions in excess of the minimum requirements of LAC 33:III.2153(B), the DEQ properly and reasonably concluded that application of the pertinent regulations should not penalize Dow for choosing “over control” over “minimal compliance.”
In its brief on appeal, the DEQ sets forth that the Dow facility is located at the border of Iberville and West Baton Rouge Parishes, both of which are both designated as “nonattainment” for the one-hour ozone standard. The DEQ claims that the modifications of the facility proposed by the source in both permit applications resulted in significant net emission increases of VOC’s. As a result, the DEQ reviewed the applications to determine if the facility and the proposed projects met the required elements of LAC 33:111.504, which sets forth the “Nonattainment New Source Review Procedures.” In so doing, the DEQ maintains that it properly reviewed and determined the validity of the emission reduction credits in question that were used as offsets.
The DEQ contends that in its review and determination of the emission reduction credits by the closure of Pond EC-2, it clearly considered LAC 33:111.2153 as promulgated and the exemption provided in subsection G on whether the emission reductions remained “surplus,” as statutorily required. The DEQ contends that LEAN’S arguments fail to recognize that LAC 33:111.2153 is not applicable to every wastewater stream; only to “affected volatile organic compounds wastewater” as defined by LAC 33:III.2153(A). The DEQ agrees with Dow that by eliminating Pond EC-2 altogether and routing all wastewa-ter stream to the floating roof tank, Dow “over controlled” the VOC emissions.
|uIn regard to the specific amount of offsets allowed, the DEQ contends that increases in permit limits that are the result of more accurate determinations of the source’s potential to emit do not require offsets. The DEQ points out that there is a distinction between a permit modification and modifications of the facili *14 ty. Citing LAC 33:111.504, the DEQ claims that offsets are only required for a “major modification” of the facility. While the permits at issue herein authorize both a “major modification” of the facility and properly required offsets for the increase in emissions as required by the Nonattainment New Source Review Program, the DEQ contends that the permits also increased permitted emission limits for certain sources within the existing facility that were not affected by the major modification.
The DEQ points out that in prior permitting actions, Dow had previously estimated the maximum potential emissions from the facility based on the existing physical capacity of the facility, which was then used to establish a permit limit. Since that time, the facility improved its ability to estimate its potential emissions and Dow requested a revision to its permitted limits to reflect the potential emissions accordingly. Further, the DEQ notes that LAC 33:111.504 is only applicable to new emissions that are the result of either “construction” of a brand new “major source” or a “physical change or change in method of operation” at an existing major source that results in a “net emissions increase” above a threshold amount. The DEQ contends that because the increase in permitted emissions is not the result of the proposed modification, there is no requirement for offsets.
The DEQ notes that on September 11, 2002, the DEQ forwarded the proposed Cellulose permit together with the information regarding the validity of the ERC’s as offsets to the Environmental Protection Agency. I^The DEQ notes that the Environmental Protection Agency had forty-five days to review the proposed permits pursuant to 40 C.F.R. Part 70 and LAC 33:111.533, including review of the validity of the emission reduction credits, and object to the issuance of the permits. The DEQ notes that the Environmental Protection Agency did not object to the DEQ’s determination of the emission reduction credits and contends that this court, like the district court, should defer to the DEQ’s soundly reasoned and amply documented consideration of these matters. After careful review, we agree.
Mindful of its standard of review, the district court stated in written reasons that after reviewing the record, the court found that the DEQ had not been arbitrary in its permit decision. The district court specifically noted that the record clearly showed that the DEQ had entered into the requisite fact-finding and cost-benefit analysis. The district court also found that after the parties agreed at the hearing that the Modified Low Salt Project aspect of the permit was withdrawn, there were sufficient emission reduction credits in Dow’s favor applying either the DEQ’s or LEAN’S analysis of the credits. Lastly, the district court found that the record indicated that the DEQ had reached its decisions after appropriate public debate and proper consideration of the public interest in granting the permits. After thoroughly reviewing the record before us on appeal, and the district court’s sound reasons for rejecting the petition for judicial review, we find no error.
At the outset, we note as did the district court that petitioners failed to present any expert testimony to establish their claim that the DEQ erroneously calculated the amount of the emission reduction credits or to show what, if any, credits would apply. Absent any such testimony, and given the record as a whole, we find no basis for concluding that the DEQ |lfiacted “without reason.” See Calcasieu League For Environmental Action Now, 661 So.2d at 150.
*15 Moreover, for each application, we note that the DEQ painstakingly conducted and documented, its thorough analysis, which considered the background, public comment, public comment response summary, alternative sites, alternative projects, mitigating measures, avoidance, of adverse environmental effects, cost/benefit analysis, social and economic benefits, and environmental justice/civil rights Title IV issues as mandated by the Louisiana Supreme Court in Save Ourselves, Inc. In so doing, the DEQ sufficiently addressed (1) the potential and real adverse environmental effects of the proposed project have been avoided to the maximum extent possible; (2) a cost-benefit analysis of the environmental impact costs balanced against the social and economic benefits of the project demonstrates that the latter outweighs the former; and (3) alternative projects or alternative sites or mitigating measures that would offer more protection to the environment than the proposed project without unduly curtailing non-environmental benefits to the extent applicable. See In re Belle Company, L.L.C., 2000-0504 at pp. 16-17, 809 So.2d at 238; In re Rubicon, Inc., 95-0108 at p. 12, 670 So.2d at 483. Thus, we specifically reject the argument that DEQ failed to comply with its constitutional mandate in considering and acting upon Dow’s requests.
Given our standard of review, absent a showing that the balance of costs and benefits that was struck was arbitrary or that the DEQ gave insufficient weight to environmental protection, we decline to reverse the DEQ’s decisions herein. Further, we conclude that the findings of fact are amply supported by a preponderance of evidence in the record, and that the 1 17DEQ’s permitting decisions are amply supported by a detailed articulated basis for the grant of each permit and application.
After reviewing the record and considering the arguments advanced by the parties, we find that the appellants fail to demonstrate that the DEQ acted arbitrarily or failed to give sufficient weight to environmental concerns in balancing the costs and benefits of granting the two major air pérmit modifications and approving the VOC Emission Reduction Credit application. Rather, the record demonstrates that the DEQ reasonably determined that any adverse environmental impacts had been minimized or avoided as much as possible consistent with the public welfare.
These assignments of error lack merit.
CONCLUSION
For the above and foregoing reasons, the June 24, 2003 judgment of the trial court is affirmed. Costs of this appeal in the amount of $422.61 are assessed against appellants, Louisiana Environmental Action Network and Albertha Hasten.
AFFIRMED.
FITZSIMMONS, J., concurs and assigns reasons.

. Albertha Hasten is a concerned resident of Iberville Parish, who lives near the Dow facility.

. According to the district court’s written reasons for judgment, the parties agreed to withdraw the Modified Low Salt Project aspect of the permit application. Although the judgment indicates that the parties appeared before the district court for oral argument on May 27, 2003, a transcript of the hearing is not contained in the record before us on appeal.

. The Environmental Protection Agency designates each air quality control region within the state on the basis of whether the region meets applicable ambient air quality standards. If the control region complies, it is said to be “in attainment.” Regions that do not comply are in "nonattainment.” See 42 U.S.C. 7407(b). The attainment status is determined for each criteria pollutant. According to the DEQ, all regions in Louisiana are in attainment for all criteria pollutants except ozone. The following five parishes from the Baton Rouge Metropolitan Statistical Area are in nonattainment status regarding the one-hour ozone standard: Ascension, East Baton Rouge, Iberville, Livingston, and West Baton Rouge.

.As the proposed modifications to both the Light Hydrocarbons III Plant and Cellulose Plant resulted in "significant” increases in emissions of VOCs in an area classified as nonattainment for ozone, they each constituted a "major modification” pursuant to the Nonattainment New Source Review requirements, and "offsets” for the increases resulting from the proposed modifications to the facility were required. An "offset” is a decrease in previously existing emissions to cancel out emission increases associated with the proposed modification of the facility.

. Subsection 2153 of LAC 33:111 is entitled, "Limiting Volatile Organic Compound Emissions From Industrial Wastewater.”

. LAC 33:111.2153(B) provides in part:
Control Requirements. Any person who is the owner or operator of an affected source category within a plant shall comply with the following control requirements. Any component of the wastewater storage, handling, transfer, or treatment facility, if the component contains an affected VOC wastewater stream, shall be controlled in accordance with Subsection B.l, 2, or 3 of this Section. The control requirements shall apply from the point of determination of an affected VOC wastewater stream until the affected VOC wastewater stream is either returned to a process unit, disposed of in an underground injection well, incinerated, or treated to reduce the VOC content of the wastewater stream by 90 percent and also reduce the VOC content of the same wastewater stream to less than 1000 ppm by weight. For waste-water streams that are combined and then treated to remove VOC, the amount of VOC to be removed from the combined wastewater stream shall be at least equal to the total amount of VOC that would be removed from each individual stream so that they meet the reduction criteria mentioned above in this Subsection.